SUPERIOR COURT 
 
 HEMBIO, INC. F/K/A HEMERA BIOSCIENCES, INC. v. PAUL FIREMAN, ADAM ROGERS, AND HEMERA BIOSCIENCES, LLC

 
 Docket:
 2184CV01346-BLS2
 
 
 Dates:
 May 13, 2025
 
 
 Present:
 Kenneth W. Salinger Justice of the Superior Court
 
 
 County:
 SUFFOLK
 

 
 Keywords:
 FINDINGS AND CONCLUSIONS AFTER A BENCH TRIAL
 
 

 Hembio, Inc., was founded to develop a gene therapy treatment for age-related macular degeneration, which over time degrades the part of the retina needed for clear central vision. Paul Fireman held the largest minority ownership interest in Hembio. His son-in-law Adam Rogers was chief executive officer and a director. When the company was unable to raise funds needed to continue its clinical trials, and about to run out of cash, Hembio sold its assets to Hemera Biosciences, LLC, a new company formed and wholly owned by Fireman. In exchange, Fireman paid almost $680,000 to cover Hembio’s debts, gave 10 percent of Hemera’s membership interests to Hembio’s stockholders and noteholders, and committed to providing $40 million in further funding to continue clinical trials of the experimental treatment. One year later, after Fireman had provided about $6 million of the additional funding, Hemera sold the same assets for $85 million plus possible future milestone payments.
Hembio contends that Rogers and Fireman deceived the board about prospects for selling the company’s assets to other potential buyers and thereby tricked it into selling the assets for less than they were worth. Though two of Hembio’s founders caused the company to bring this lawsuit, neither they nor other Hembio investors have challenged the board’s decision to sell the company’s assets or asserted personal claims for damages. Instead, Hembio claims that Rogers is liable for breaching his fiduciary duty of loyalty to the corporation, and that Fireman and Hemera aided and abetted Rogers’ alleged breach of that duty. The parties agreed to try these remaining claims without a jury.
The Court finds that Hembio did not release its claims against Rogers, but that Hembio failed prove that Rogers breached his duty of loyalty to the corporation by withholding material information from the board. Since Hembio has not shown that Rogers committed a fraud on the board, under Delaware law Rogers’ conduct is protected by the business judgment rule and he is not required to show that Hembio’s asset sale met the “entire fairness” standard. Delaware’s “enhanced scrutiny” standard does not apply either because
 
                                                            -1-
 
Hembio is seeking to impose personal liability upon Rogers, and no shareholders have asserted a claim requiring Hembio’s board to justify the asset sale transaction.
The claim that Fireman and Hemera aided and abetted an alleged breach of fiduciary duty is barred by Hembio’s release of claims against Fireman and Hemera as part of the asset sale. In any case, since Hembio failed to prove that Rogers breached his fiduciary duty to the corporation, or that Fireman or Hemera knowingly participated in Rogers’ alleged withholding of information, Fireman and Hemera cannot be liable on an aiding and abetting theory.
1. Findings of Fact. Before trial, the parties agreed on certain facts in their joint pretrial memorandum, and submitted proposed findings of fact in which they stipulated that many of the background events were not in dispute. During the 11-day bench trial, the parties elicited testimony from eight witnesses and (incredibly) introduced 774 exhibits. The Court makes the following findings of fact based on the facts that the parties have stipulated are undisputed, the testimony and exhibits presented at trial, its evaluation of witness credibility, and reasonable inferences that the Court has drawn from the evidence.
1.1. Hembio’s Origins. Hembio was formed in 2010 four colleagues at the Tufts University School of Medicine (the “Founders”). Three of the founders—Jay Duker, M.D., Elias Reichel, M.D., and Adam Rogers, M.D.—are ophthalmologists. The fourth, Rajendra Kumar-Singh, Ph.D., is a research scientist. They wanted to work together through Hembio to try to develop a novel gene therapy drug to treat age-related macular degeneration (“AMD”) and guide it through clinical trials.
When Hembio was formed, it was known as Hemera Biosciences, Inc. The contract by which Hemera Biosciences LLC purchased the company’s assets in 2019 required Hembio “to change its corporate name to a name dissimilar to ‘Hemera Biosciences.’ ” Hemera is the Greek goddess of daylight.
Rogers had trained to be a retina surgeon under Duker and Reichel. By 2005 the three of them were in practice together. Duker served as chair of the Ophthalmology Department; he wanted to bring in a scientist to study retinal diseases. At Duker’s request, Rogers convinced Paul Fireman’s foundation to pay to fix up the available laboratory space. Duker and Reichel then recruited Kumar-Singh to join the department, around 2007, to do research on gene therapy for retinal diseases.
 
                                                            -2-
 
In 2008, several published papers suggested that AMD had a strong genetic component in the complement system, which is part of the human immune system and helps people to ward off infections. Thereafter, based in part on conversations with Duker and Reichel, Kumar-Singh began to focus his laboratory’s  research  on  exploring  a  genetic   treatment   for   dry  AMD. He developed a potential gene therapy drug designed to cause a patient’s eye to produce more of a protein that protects cells from damage caused by the end product of a complement cascade. The hope was that this drug would prevent further damage to cells in the retina and thus prevent further loss of vision in patients with AMD. This drug came to be called HMR59. Kumar-Singh discovered that injecting it into the eye seemed to work as well as implanting it surgically under the retina. Kumar-Singh and others patented the technology through Tufts and disclosed it in a published paper.
Duker, Reichel, Kumar-Singh, and Rogers decided to license this technology from Tufts and raise funds to pay for clinical trials to test the safety and efficacy of HMR59 as a treatment for AMD. The Founders believed that, to convince investors to support Hembio’s work, they would need to: establish that the complement system was in fact causing AMD; show that a single injection of HMR59 into the eye would be an effective treatment for AMD for the patient’s lifetime and would not create risks of adverse side effects; and demonstrate that the drug could be manufactured in sufficient quantities to be marketable.
1.2. Initial Organization and Fundraising. The four Founders were Hembio’s initial board members. Duker served as Hembio’s first CEO, but only on a part- time basis. Reichel and Rogers took on responsibility for fundraising. Over time, Rogers increasingly took on operational responsibility as well.
When they first formed Hembio in 2010, Duker, Reichel, and Rogers each contributed $21,500 of initial working capital; Kumar-Singh contributed $6,500.
During 2013, Hembio was able to raise about $3.9 million from investors through an offering of preferred, Series A stock. Most of these investors were family, friends, or colleagues of the Founders. Paul Fireman, who is Dr. Rogers’ father-in-law, was the single largest investor, he invested $1 million in this financing round. Rogers invested another $250,000. Duker and Reichel each invested an additional $100,000. Kumar-Singh did not invest further.
With this initial funding in hand, in early 2014 Hembio was able to obtain an exclusive license from Tufts to research, develop, make, and sell products using the HMR59 technology. The license required Hembio to use “commercially
 
                                                            -3-
 
reasonable efforts to proceed with the development, manufacture and sale” of the HMR59 treatment, including achieving certain deadlines for obtaining additional funding and enrolling patients in clinical trials.
In September 2014, Hembio granted each of the four Founders options to buy up to 100,000 additional shares of Hembio at a fixed price of $2.99 per share. The options would vest over time as certain milestones were reached. These options had fully vested by early 2019, if not before.
The Founders all agreed that Hembio needed to raise additional funding in order to undertake Phase 1 testing on human patients to establish whether HMR59 was safe. In March 2015, Hembio completed a second financing round, raising an additional $5.1 million by issuing convertible notes. Fireman invested another $1.33 million, cementing his status as Hembio’s largest investor. The Cormorant Global Healthcare Master Fund and Perceptive Life Sciences each invested $1 million. Reichel had served as a consultant to Cormorant Asset Management and Perceptive, two of the larger institutional investors in biopharmaceutical companies, about potential investments. Rogers invested an additional $75,000 at this time. The other three Founders (Duker, Reichel, and Kumar-Singh) did not invest any additional funds.
Fireman joined the Hembio board around late 2015. He remained a board member until October 3, 2019. The Founders all continued to serve on the board until Hembio sold substantially all of its assets to Hemera in late 2019.
Fireman and Rogers never controlled Hembio. At all times the three other Founders—Duker, Reichel, and Kumar-Singh—owned a majority of Hembio’s common shares and together had majority control of Hembio’s board.
1.3. Rogers Becomes CEO, Phase 1 Study Proceeds. Hembio conducted initial testing of the safety of the HMR59 treatment on non-human primates and mice from March 2014 through December 2016. Based on those results, the Food and Drug Administration approved Hembio’s application to begin human clinical testing of the treatment as an Investigational New Drug in early 2017.
Phase 1 testing of HMR59 as a treatment for dry AMD on human volunteers got underway soon thereafter. A total of 17 patients were enrolled in this study; they received their injections of the drug from March through December 2017.
The FDA required that each of these patients be followed for at least 24 months to evaluate the safety of the treatment. Hembio did not start enrolling patients with wet AMD for Phase 1 study until September 2018.
 
                                                            -4-
 
Once the Phase 1 testing had begun, the Founders realized that Hembio needed a full-time CEO to keep the clinical testing going, work on figuring out how to manufacture larger quantities of HMR59, and raise substantially more money to fund Phase 2 clinical testing of the treatment’s efficacy and safety on a much larger population of patients if the Phase 1 testing was a success.
It was hard to attract strong CEO candidates because Hembio was not well funded. The Founders interviewed several outside candidates for the job, but did not think that any of them was a good match. The CEO role was offered to all of the Founders, but Duker and Reichel did not want to give up their medical practices and Kumar-Singh did not want to give up his research position. They all agreed that Rogers was the best person to lead Hembio as a full-time CEO, and asked Rogers to fill this role. Rogers agreed.
The Hembio board selected Rogers to serve as CEO in June 2017. It then took the other Founders over five months to negotiate and finalize Rogers’ employment contract. Fireman was troubled that Duker, Reichel, and Kumar- Singh took so long to make a contractual commitment to Hembio’s new CEO.
The 6-month Phase 1 dry AMD data, which became available in mid-2018, showed very little. There were no indications of safety concerns, but it was too early to see whether HMR59 was effective in slowing the progression of AMD. The same was true of the 12-month data received in January 2019.
1.4. Failed Series B Investment Offering. During 2018, Dr. Rogers spent much of his time identifying and meeting with potential investors, trying to raise enough money to fund Phase 2 testing. In October 2018, Rogers told the Hembio board that Phase 2 trials would cost almost $50 million. By that time, Rogers had met with at least 39 potential additional investors. Ultimately none of them was willing to invest in Hembio or acquire its assets.
In November 2018, Rogers told the board that Hembio had $2 million in cash remaining. The board also knew that Hembio was going to have to repay more than $5 million, plus interest, to its noteholders in January 2020.
Rogers recommended that they pursue a more formal Series B fundraising round seeking enough funding to continuing Phase 1 testing and prepare for Phase 2. Fireman agreed to be the lead Series B investor and to commit an additional $15 million in funding, subject to the condition that Hembio raise at least $20 million from other sources. The board voted in November 2018 to approve a Series B term sheet calling for a minimum fundraising threshold  of $35 million, with a four-month deadline for Hembio to raise the additional
 
                                                            -5-
 
$20 million needed to unlock Fireman’s agreement to provide the remaining $15 million.
Despite the Founders’ efforts, Hembio was unable to generate any significant interest in the Series B offering. In March 2019, when the initial Series B deadline was about to expire, Fireman agreed to extend his offer to be the lead investor in that round by 180 days, through mid-September 2019. No investor other than Fireman ever was willing to participating in the Series B round.
At about the same time in March, the board voted to formally engage Guggenheim Partners, a financial investment firm, to work with Hembio on its finances, subject to acceptance by Guggenheim’s Review Committee. Guggenheim agreed to act as financial advisor for any sale of Hembio or its assets, but declined to help Hembio find additional investors to fund Phase 2 trial. Hembio and Guggenheim executed an engagement letter in early June 2019. Up to that point, Guggenheim had only been giving informal investment banking advice to Hembio; Fireman had an established relationship with a Guggenheim principal who had helped Fireman to sell Reebok years before.
Two weeks after Guggenheim agreed to be Hembio’s financial advisor with respect to a potential sale of the company, Fireman made a private offer to pay Kumar-Singh $2.4 million to purchase two million of his common shares, subject to conditions that Kumar-Singh vote to add two directors elected by Series A stockholders and to reduce the number of directors elected by common stockholders from four to three, and that he then resign from the board. Kumar-Singh did not accept the offer. Though Fireman had told Rogers he was going to make this offer, Rogers was not in favor of him doing so and had no substantive discussions with Fireman about this offer. Neither Fireman, Rogers, nor Kumar-Singh told Duker or Reichel about this offer.
1.5. Marketing the 18-Month Clinical Data. In late June 2019, Rogers received Hembio’s 18-month clinical testing data and shared them with the board. These results were promising; they showed that the HMR59 treatment seemed to be slowing the worsening of AMD in the trial subjects.
In an email sent on June 20, 2019, Rogers told the other board members that these results “are very encouraging” and “are demonstrating a biological effect of the drug.” But Rogers also told the Board that Hembio had only $1 million of cash left, was spending about $150,000 each month, and in addition would have an extra $150,000 bill coming due in the next week or so. Rogers warned
 
                                                            -6-
 
the board that, in his view, Hembio needed to close a Series B round within the next 45 to 60 days or it would run dangerously low on cash.
Rogers told the board the contract it had approved with Guggenheim had been signed, and that Guggenheim was finalized a slide deck and pitch to send to companies to elicit possible interest in acquiring Hembio. But Rogers also told the board that Guggenheim did not “anticipate any action” from potential acquirers before September 2019, and warned that by then Hembio would likely be out of cash to fund continuing operations.
Rogers sent the 18-month data to all known potential investors that had still expressed any level of interest in participating in a Series B funding round. Ultimately, none of them was willing to invest. Over the Summer, Reichel and Rogers made a presentation to Perceptive, asking them to make a Series B investment; Perceptive declined. They also reached out to Cormorant, which said it was not interested in making a further investment in a Series B round.
All five board members (Duker, Fireman, Kumar-Singh, Reichel, and Rogers) met by telephone on July 2, 2019. Rogers reported that he had met with more than 70 investment firms or high-net-worth investors about the Series B funding round, and that only Fireman was willing to invest. He reiterated that Hembio had retained Guggenheim to find a buyer for Hembio, and reported that Guggenheim was in the process of finalizing a secure data room to provide interested companies with online access to Hembio detailed clinical testing data, but explained that it could take at least four more months to identify a suitable match.
And Rogers told the board that by the end of July Hembio would have only $700,000 in cash remaining, which would give Hembio only two months to continue in operation before it would need to use its remaining funds to wind down company operations. In other words, Rogers was telling the board that without new funding Hembio would have to stop its clinical trial and plan to go out of business by around the end of September 2019.
Dr. Rogers proposed on this call that all four Founders make equal additional investments in order to keep Hembio in good financial standing and give it more time to arrange either for a Series B fundraise or to be acquired. Dr. Kumar-Singh stated that he was not financially able to participate. Dr. Duker said he wanted to get more information from Guggenheim about the timeline for identifying a possible acquirer. Dr. Reichel did not respond.
 
                                                            -7-
 
1.6. Guggenheim’s Early Efforts in July 2019. A week later, on July 9, Rogers emailed the board with an update about Guggenheim’s efforts on behalf of Hembio. He reported that Guggenheim would start over the next two weeks to send out their final slide deck and then make follow up calls to 14 listed companies as well as some others. The companies that Rogers identified as targets of Guggenheim’s outreach included two very large pharmaceutical companies: Janssen, which is a wholly-owned subsidiary of Johnson & Johnson, and Merck. The board members understood that the reference in this email and in other written communications to Johnson & Johnson (which was sometimes shortened to JnJ or J&J) was a reference to its subsidiary Janssen Pharmaceuticals. Rogers and Kumar-Singh had an initial meeting with Janssen in October 2018, and Rogers met with Janssen representatives a second time at J.P. Morgan’s annual Healthcare Conference in January 2019. Similarly, Rogers and Kumar-Singh first met with Merck representatives in April 2019, and Rogers met with them a second time a few weeks later.
In his July 9 email, Rogers also said that he would be meeting “with the entire Merck group” on July 22, and invited other board members to attend. Kumar- Singh joined Rogers for that meeting, which was held as scheduled.
Rogers also reported that he would be attending the upcoming American Society of Retina Specialists (“ASRS”) conference.
Rogers informed the Board by email on July 17, 2019, that he was starting to meet with potential “strategic partners” that had been waiting to see Hembio’s 18-month results, noting that he had just met with Astellas and was expecting to meet with Merck, Kala Bio, and Janssen. He reported that Hembio had no more than three months of operating cash remaining. Rogers told the board that he was willing to help fund Hembio’s continuing operations, “but only if all four founders equally infuse a minimum of 12 months operating capital;” he explained that, given the company’s $150,000 monthly burn rate, that means they would need to invest an additional $2 million. Rogers also stated that given Hembio’s financial situation they would start to have weekly board calls to keep everyone up to date.
A week later, on July 25, Rogers sent the board an update from Guggenheim. The summary page prepared by Guggenheim reiterated that it was in contact with Astellas, Janssen, Kala, and Merck to gauge their interest in buying Hembio, and listed other companies that Guggenheim was reaching out to.    It confirmed that Rogers had met with Merck on July 22 and  with Kala on July 23, and that Hembio was “awaiting follow-up” from both of them.
 
                                                            -8-
 
Rogers quoted their main contact at Guggenheim as explaining that summer was not a good time to push companies about acquiring Hembio, that Guggenheim would be sending a “revised presentation” to potential targets “in the coming days,” and that Guggenheim’s aim was “to prime teams for bid timelines once we have a bit more visibility.” The Founders would have understood this to mean that during the Fall Guggenheim planned to ask companies it was contacting on Hembio’s behalf to present any bids to acquire Hembio or its assets by “bid deadlines” that Guggenheim would set after those companies had sufficient time to focus on Hembio’s 18-month data.
Rogers further briefed the board by telephone on July 25, 2019. He reiterated that Hembio was quickly running out of cash, and again said the board should meet weekly. All board members agreed. Rogers once again urged all of the Founders to invest and buy enough of their stock options that Hembio could remain in business for at least some time. After discussion, Rogers also agreed to work with corporate counsel to draft a term sheet that could be sent to all Series A investors, to solicit additional investments through a Series A-2 round.
During this call, Rogers made clear that Merck seemed to be showing real interest in a possible acquisition of Hembio. Rogers explained that Kumar- Singh had met with representatives of Merck at a conference in Vancouver in April 2019, and that Rogers followed up with a meeting at Merck a week or two later. Rogers reported that on July 22 he and Kumar-Singh had a third meeting with Merck.
During August, Rogers let the board know that Merck wanted to see Hembio’s detailed data and had signed a confidential disclosure agreement (or “CDA”), and that Rogers was setting up a comprehensive data room for Merck to access. For a short time Merck had technical problems accessing the data, but Rogers told the board on September 9 that the problems had been resolved and that Merck was able to access the data.
Rogers also told the board during the July 25 call that he had met twice with Janssen, and that he had received an email saying that Janssen was interested in having a follow-up meeting after the upcoming ASRS conference.
During the board’s meeting on August 1, Rogers reported on Merck’s CDA, Rogers and that Guggenheim had sent its slide deck to about 20 potential suitors. But he reiterated that Guggenheim’s efforts would not lead to any transaction by the end of August, when Hembio would effectively be out of cash, other than what it would need to spend to wind down its operations.
 
                                                            -9-
 
Dr. Rogers told the other Founders that if they bought all of their stock options that would provide Hembio with over $1 million in emergency funding. Kumar-Singh again stated that he was not in a financial position to provide any case to the company. Neither Duker nor Reichel expressed any interest joining Rogers in providing additional funding.
1.7. Failed Series A-2 Offering. Dr. Rogers sent the board members a proposed term sheet for a Series A-2 fundraising round on August 8, 2019, in advance of the board’s August 12 meeting. The term sheet said that Hembio was seeking to raise between $1 million and $3 million in emergency capital to fund the company for six to 12 months. The minimum threshold was $1 million; if investors were not willing to provide at least that amount in additional funding then the Series A-2 round would not go forward.
During the August 12 meeting, Kumar-Singh voiced the board’s understanding that Guggenheim was going to press all companies that might become interested in acquiring Hembio to provide a “definitive answer … within the next three or four months,” meaning by mid-December at the latest.
After a lengthy further discussion at that meeting, Duker, Fireman, and Rogers voted to approve the Series A-2 term sheet; Reichel and Kumar-Singh voted against. Afterward, Rogers and Hembio’s counsel convinced Reichel to change his vote to a yes. Though Reichel ultimately voted in favor of asking all of the Series A investors to provide additional funds, he did not think that investing more money in Hembio would lead to anything; that is why had originally voted against sending out the Series A-2 term sheet.
After the board approved this term sheet, Hembio sent the Series A-2 offering to all of the Series A investors. The cover memo informed the Series A investors that Hembio had been making “significant progress;” clinical trials showed that HMR59 had a clear biological effect in slowing the progression of dry AMD; Hembio “continues to actively meet with strategic pharmaceutical companies, venture capital, and hedge funds;” and that the company needed additional funding from its stockholders “to continue clinical testing to bridge the Company to either a Series B financing round or acquisition.”
When the board members spoke again on August 29, Rogers reported that he had received several indications of “no interest” in the Series A-2 round from existing investors, and said that it was important for the Founders to commit the first funds to inspire confidence from the other shareholders. Rogers then offered to invest an additional $250,000 through the Series A-2 round. Duker
 
                                                            -10-
 
offered to invest $9,500. Reichel declined to provide any additional funding, and Kumar-Singh again said he did not have the financial capacity to do so.
As a result, Rogers told the board that he did not see a viable path to be able to raise at least $1 million, and was concerned that there was no longer any way to avoid having to wind down the company or declare bankruptcy. Reichel also thought it was clear that the Series A-2 offering would not be successful. And Duker had similarly concluded by this time that investors had no confidence that Phase 2 testing of the HMR59 treatment would be successful.
Duker, Reichel, and Rogers were correct. The Series A investors had no interest providing Hembio with additional funding. On September 6, the Series A-2 round formally closed. Hembio failed to reach the $1 million minimum threshold.
1.8. Fireman’s September Financing Offer, Guggenheim’s Work. The board members spoke on September 3, 2019, days before the end of the failed A-2 round. Fireman said any investor willing to provide $3 million at this point really had to be willing to provide at least $40 million to finance a Phase 2 clinical study, because emergency funding of $3 million would make no sense without a guarantee that Hembio could continue with the next phase of drug development. Duker and Kumar-Singh agreed with Fireman’s analysis of Hembio’s situation. Duker than asked Fireman whether he would be willing to make such a commitment.
Fireman responded by making a proposal. He expressed willingness to commit $40 million in additional funding on a staged basis, to give Hembio a chance to succeed in proving the value of the HMR59 treatment, but said that if he was going to do so it would be foolish to take the current investors with him at their present ownership shares. Fireman said a condition for making such a commitment would be that the Founders must agree to reduce their ownership share or sell their stock entirely. Fireman said that he would pay Duker, Reichel, and Kumar-Singh $500,000 each if they agreed to reduce their collective ownership interest to five percent of the company, and to pay them $750,000 each if they sold him all of their Hembio stock. Fireman told the Founders that they were free to share his proposal with other investors and try to use it to convince them to invest money on different terms. Kumar-Singh asked Fireman to put this offer in writing. He agreed to do so.
The next day, on September 4, Fireman fleshed out his proposal in a written term sheet provided by his attorney. Fireman offered to commit to providing
 
                                                            -11-
 
up to $40 million in additional funding for Hembio, divided in tranches based on the company meeting specific milestones, and contingent on converting all shareholder classes and convertible debt to common shares. He offered that existing Hembio investors could share a 15 percent ownership interest going forward, with five percent going to the common shareholders (the Founders), five percent to the Series A investors, and five percent to the noteholders.
Fireman’s term sheet gave Duker, Reichel, and Kumar-Singh three options for the treatment of their ownership interests. Each of them could chose to: (I) receive a $500,000 payment if they agreed to convert their existing shares to a pro rata portion of a five percent interest in the company, give up their board seat, and sign a non-competition agreement; (ii) receive a $750,000 payment if they agreed to sell all of their shares to Fireman so they would no longer have any ownership interest in the company, give up their board seat, and sign a non-competition agreement; or (iii) forego any payment, have their shares recapitalized in the same manner as the first option, keep their board seat, and not have to sign a non-competition agreement.
Fireman did not include a no-shop provision in his September 4, 2019, term sheet, which meant that the Founders were free to show it to other potential investors and try to use it to convince someone else to make a competing offer. But none of them did so.
By this time, Reichel had concluded that there was no point in continuing to reach out to potential outside investors, because there was nothing new to add to the Hembio story. They had shared the somewhat encouraging 18-month data, that was not triggering any interest, and Reichel believed that without significant new information other companies would have no reason to want to purchase or otherwise invest in Hembio. Reichel did not reach out again to his contacts at Perceptive or Cormorant because he and Rogers had just spoken with those companies, both had made clear that they were not interested in investing further in Hembio notwithstanding the 18-month clinical data, and nothing had changed.
Duker similarly felt that, since the Series B and Series A-2 fundraising efforts had failed, Hembio’s only options were to sell the company or its assets, to wind down operations and go out of business, or to declare bankruptcy.
O87n September 6, Guggenheim sent a current status report to Duker at his request, and Duker forwarded the document to Reichel and Kumar-Singh. That report confirmed that Merck was entering the data room to review more
 
                                                            -12-
detailed clinical data, a sign of continuing interest. It also reported that Guggenheim was scheduling a face-to-face presentation to AGTC (Applied Genetic Technologies Corporation); had made a presentation to Aldeyra Therapeutics and was waiting to hear back; and was in contact with Astellas, Janssen, Kala, and Santen. The status report also showed that Guggenheim had been in touch with twenty-two other companies on behalf of Hembio, and described the status of those contacts.
On September 9, 2019, the Founders, acting as Hembio’s board, unanimously approved Fireman’s term sheet. Fireman did not participate in this meeting. During this meeting, Kumar-Singh complained that he owned more shares than the other Founders but had not been offered any extra benefit as a result. Rogers and Hembio’s attorney told Kumar-Singh that he should raise his concern with Fireman.
The next day, September 10, Duker, Reichel, and Kumer-Singh all opted for the $750,000 buyout option. None of them wanted to retain any stake in Hembio, but instead opted to cash out their ownership interest and give up their board seat in exchange for an immediate payment in this amount. They understood that signing a non-competition agreement was also a condition of accepting this option. But ultimately none of them was willing to accept the broad non- competition agreement that Fireman proposed as a condition of paying that amount. Kumar-Singh told Fireman in an email that Firemen was doing “a wonderful thing” for Hembio and that “[t]he project simply dies without the financial risks you’re willing to take.”
When Kumar-Singh emailed Fireman on September 10 to say he was choosing the $750,000 payout option, Kumar-Singh also noted that he held about 400,000 more shares than the other Founders and asked for “consideration for those extra shares.” In response, Fireman said that Rogers would be offering Kumar- Singh an extra two percent stake “for simply hitting milestones that we can agree on.” Rogers followed up that evening by sending Kumar-Singh a rough draft of a consulting agreement with Hembio providing that Kumar-Singh would be granted a stock option equal to a two percent ownership stake that would vest when as-yet unspecified milestones were met. Rogers asked Kumar-Singh to keep the email confidential. He did so. Neither Duker nor Reichel learned of this offer during 2019. Kumar-Singh did not accept this offer before Fireman withdrew his refinancing proposal at the end of September.
One of the reasons that Kumar-Singh resisted signing a broad non-competition agreement is that he had created a company called Visiogene in April 2019 to
 
                                                            -13-
 
develop gene therapies for blindness. Fireman and Rogers did not know anything about Kumar-Singh’s involvement with Visiogene.
By this time Duker and Reichel also had experience with biopharmaceutical startups other than Hembio. In 2016, Duker joined the board of company know called EyePoint, which had a technology platform to deliver therapeutic agents to treat wet and dry AMD. As a board member Druker provided strategic guidance and advice. He became chief scientific strategy officer, and then chief operating officer, and now serves as CEO of EyePoint. As of 2019, Reichel had been consulting with at least eight other biotech companies.
On September 26, Guggenheim responded to Kumar-Singh’s request for an updated status report, telling him that Merck “remain the most engaged counterparty;” Aldeyra “has not yet determined their level of interest;” a meeting was scheduled with AGTC; and Astellas, Janssen, Kala, and Santen “have been rather quiet” but Guggenheim hoped that they would “come back” now that the summer was over. Guggenheim offered to provide more detail. Kumar-Singh asked how soon they were likely to hear from Merck. Guggenheim responded that they were “still awaiting a true second step from any counterparty,” and that Merck was unlikely to move quickly because “they have only involved a few ophthalmology team members to date.”
During September, Duker, Reichel, and Kumar-Singh understood that they could move forward with Fireman’s offer without having to sign a non- compete if they instead picked the option of accepting dilution of their ownership interest without receiving any payment from Fireman. But they all wanted to get completely out of Hembio, relinquish their stock to Fireman, and walk away with $750,000 each—with the hope that Fireman would accept much narrower non-competition agreements than he had requested.
Fireman declined to accept much narrower non-competition agreements but still pay $750,000 each to Duker, Reichel, and Kumar-Singh. The morning of September 30, 2019, Fireman’s attorney sent an email to Rogers stating that Fireman was withdrawing his proposals to provide additional funding to Hembio and to purchase the Founders’ shares “due to a breakdown in the negotiations between Mr. Fireman and the three Founders.”
Rogers called an emergency board meeting to call a vote to retain an attorney to help wind down the company and distribute any remaining funds to Hembio’s creditors. But Duker objected on the ground that the bylaws required 24-hour’s notice for any board meeting. As a result, that meeting was cancelled.
 
                                                            -14-
 
1.9. Early October Developments. Fireman resigned from Hembio’s board on October 3, 2019. Later that day the remaining board members (the Founders) met by telephone.
Rogers told the other Founders that he was still speaking with Merck, Regeneron, and AGTC about a possible acquisition of Hembio, that he had meetings set up in the next few weeks, but that it was hard to have those conversations when Hembio had “no cash and no future.” The Founders spoke at length about whether it was time to wind down operations and ask creditors to accept partial payment on what they were owed, or instead declare bankruptcy.
The Founders made clear that they understood Guggenheim was continuing its outreach efforts on Hembio’s behalf. And they knew from Guggenheim’s reports to Ducker and Kumar-Singh during September that Guggenheim was helping to set up the Merck and AGTC meetings.
The board spent much of this meeting weighing the pros and cons of winding down operations, filing for bankruptcy, or simply “going dark” and ceasing operations despite Hembio’s contractual obligation to Tufts to use commercially reasonable efforts to develop HMR59. They also discussed the fact that in early January Hembio would become obligated to pay its noteholders $5.8 million, including accrued interest.
The next day, October 4, Rogers sent an email calling for another board meeting on October 7. He also reported that he had met with Merck that afternoon, they had discussed pre-clinical and clinical results for 90 minutes, and that the meeting “went well and they will be in touch.” Rogers said that Merck told him the next step would be to meet with Merck’s CMC group. The Founders would have understood that this was a reference to “Chemistry, Manufacturing, and Controls” and that Merck was signaling that it would not decide whether it might be interested in acquiring Hembio until it could figure out whether it was feasible to manufacture HMR59 in quantities that would be needed if the drug were ultimately approved by the FDA. Rogers warned the board that continuing discussions with Merck, or any other potential acquirer, would be “a long process” and that “they are very methodical [and] deliberate.”
On October 6, Duker, Reichel, and Kumar-Singh communicated privately by email. Duker told the other two that he spoken to a bankruptcy attorney who said that Hembio had three options at this point: wind down operations, tell all creditors that Hembio was about to go bankrupt, and ask for more time to try
 
                                                            -15-
 
to get funding; file for Chapter 11 bankruptcy and try to restructure; or file for Chapter 7 bankruptcy and liquidate all assets. With respect to the wind-down option, Duker said that “the likelihood of success is close to zero” because they had “not had anyone get even close to buying or funding us,” “these processes take months to years” to complete, and Hembio will completely run out of money “before anything could possibly come to fruition.” With respect to Chapter 11 restructuring, Duker said that option “is probably not for us” since they had no real prospect “of a buyout or funding.” With respect to Chapter 7 bankruptcy, Duker said “we as a board are done as soon as it is declared.”
Reichel and Kumar-Singh both agreed in response that making a Chapter 7 bankruptcy filing “makes most sense,” in Reichel’s words.
1.10. Fireman’s October 2019 Offer to Buy Hembio’s Assets. After conferring with Rogers, Fireman decided to make one more, revised offer. On October 7, 2019, Fireman’s attorney sent to Rogers a non-binding written proposal to acquire Hembio’s assets; Rogers promptly forwarded to the other Founders.
This non-binding proposal said that Fireman would form and own 90 percent of a new entity, and commit to providing up to $40 million in funding to carry out further clinical trials of HMR59. The existing shareholders and noteholders of Hembio would collectively own 10 percent of the new entity, distributed pro rata, and would not be required to make any capital contributions; the noteholders would have to convert their interests to stock and relinquish their rights to repayment. The new entity would acquire Hembio’s assets and assume up to $1 million of Hembio’s current vendor account payables. Fireman’s counsel said that the offer would expire at 5pm on October 9.
Fireman offered an aggregate 10 percent ownership to Hembio’s existing stakeholders because he felt that people who had invested in the company over the years should get a “piece of the action” if HMR59 turned out to be commercially successful.
The board met to discuss this offer later on October 7. Duker, Reichel, and Kumar-Singh all approved this initial term sheet, authorized Rogers to sign it on behalf of Hembio, and instructed Rogers to negotiate with Fireman to finalize the agreement. After the other Founders had voted, Rogers also voted to approve the non-binding term sheet.
At this time, Duker believed that Hembio’s only options were to accept this offer by Fireman, wind down and terminate its operations, or file for bankruptcy protection. Duker was aware that Merck continued to express
 
                                                            -16-
 
interest in acquiring Hembio or its assets and that Merck had signed a confidentiality agreement, met with Rogers and Kumar-Singh, and obtained access to Hembio’s detailed data. He also knew that Rogers’ October 4, 2019, meeting with Merck had gone well. But Duker concluded that this level of interest from Merck meant very little, because there was no reason to think that Merck would decide to make any offer to acquire Hembio.
Rogers and Attorney Marc Porter negotiated on Hembio’s behalf with Fireman’s counsel about the terms of the proposed asset sale.
At the request of the other Founders, Rogers and Porter told Fireman’s attorney several times that the Hembio board wanted the ownership share of the new entity reserved for existing Hembio stakeholders other than Fireman increased from the 10 percent offered by Fireman back to the 15 percent he had offered in September. Fireman refused. By this time he was quite frustrated with Duker, Reichel, and Kumar-Singh, and for that reason unwilling to give Hembio’s common stockholders and noteholders more than a 10 percent stake in the new successor entity. The Court credits Fireman’s testimony he was not willing to allocate more than a 10 percent ownership interest to existing Hembio shareholders, and finds that stronger advocacy by Rogers to increase that figure would not have changed Fireman’s mind. Fireman believed that he was making an offer to save a bankrupt company, and was not willing to negotiate materially different terms than he had offered.
At no time during the process of negotiating a final deal with Firearm did Duker, Reichel, or Kumar-Singh seek to increase the consideration that would be paid to or otherwise received by Hembio. Their focus was on looking out for their own interests as holders of Hembio common stock, and were most concerned about what share of the new entity they and the other Hembio stakeholders would own.
Fireman’s lawyer sent an email to Rogers the evening of October 14, 2019, stating that Fireman “is not willing to increase the minority share from 10% to 15%” and attaching a more detailed non-binding term sheet. Rogers promptly forwarded this to the other Founders. This term sheet including a “no shop/confidentiality” provision. Duker, Reichel, and Rogers voted to approved this revised, still non-binding term sheet the next day. Kumar-Singh was away and did not vote. Rogers, on behalf of Hembio, and Fireman executed this term sheet later on October 15.
 
                                                            -17-
 
At the end of October, Rogers reviewed and made comments on a draft of the LLC agreement for Hemera, the new entity that was to acquire Hembio’s assets. In doing so, Rogers advocated for Fireman’s interests and against the personal interests of Duker, Reichel, and Kumar-Singh. Rogers told Fireman’s attorney that he was concerned the 10 percent minority members were “getting too many rights,” and that Fireman “needs to take control of the LLC so he is not at the mercy of the 10%.” Rogers urged that a provision requiring five days’ advance notice before any meeting of the LLC members, stating that it was “ridiculous” that the minority members of Hemera should have such a right. He also recommended deleting other provisions that would restrict how a members meeting would be conducted, give minority members rights to access Hemera’s books and records, give minority members “tag-along rights” to sell a proportionate share of their interests if Fireman were to sell 50 percent or more of his interests in the LLC, and give minority members veto rights over future amendments to the LLC agreement. Rogers did not disclose his comments on the draft LLC agreement to the other Founders.
Fireman’s attorney did not agree with or accept most of these suggestions by Rogers about Hemera’s LLC Agreement. The provisions in §§ 9.2–9.8 regarding member meetings and advance notice, in Article XI regarding members’ rights to access Hemera’s books and records, and in § 13.5 regarding tag-along rights were all included in the final form of the contract. Only § 15.1, regarding future amendments to the LLC agreement, was revised in response to Rogers’ concerns, and the final version of that provision retain significant protections for the rights of minority members. In sum, Rogers’ advocacy to limit the other Founders’ contractual rights as future minority members of the new successor LLC had no practical effect.
1.11. Sales and Market Activity after Fireman’s Second Offer. On October 13, 2019, Rogers informed Guggenheim that he had met with Regeneron, the meeting “went well,” and that Regeneron spoke of wanting to see more detailed data from nine to twelve months into Phase 2 clinical testing. Rogers understood that the data Regeneron was interested in seeing next would not be available for several years. Since it was clear that this lead was going nowhere, Rogers did not share this information with the other Founders.
Rogers and Guggenheim met with AGTC on October 18, 2019. A few days later AGTC said it wanted to sign a CDA to obtain access to more detailed data. It did so on October 23. A week later AGTC sent Rogers a list of questions about the data. On November 5 Rogers gave AGTC access to an online data room.
 
                                                            -18-
 
Two days later Guggenheim told Rogers that it was trying to get AGTC to indicate whether it had any real interest by December 10, by sending one of the “process letters” discussed below. Rogers did not share with the other Founders information about these communications with AGTC.
On October 23, Janssen emailed Rogers and Guggenheim, stating that its “extended team” would be attending the J.P. Morgan conference in January 2020, and saying that “would be the best forum to get an update” about Hembio. Rogers did not share this information with the other Founders.
In late October 2019, Iveric made public announcements that a complement- based drug it was developing to treat AMD had shown initial success in clinical trials. Iveric’s drug required a monthly injection, unlike Hembio’s product which was designed to be a one-time injection. All of the Founders were aware of this news, and knew that this initial clinical success with a complement- based gene therapy for AMD would likely make pharmaceutical companies more receptive to considering a possible acquisition of Hembio.
In early November, Guggenheim sent out “process letters” to their nine most promising potential prospects, asking that they submit a non-binding indication of interest in a transaction with Hembio no later than December 10. All of the companies that received one of these process letters had been identified by Guggenheim as potential prospects in the September 2019 status report that Guggenheim shared with Duker, who sent it on to Reichel and Kumar-Singh.
Rogers did not tell the other Founders that these process letters had been sent because he was familiar with Hembio’s prior attempts to solicit interest from each of the recipients, he had “zero confidence” that the letters would generate any meaningful response, and at that point Hembio had only about two weeks of cash left.
Rogers was correct. Guggenheim did not receive a single bid or expression of interest of any kind in response to any of these process letters. The Court does not credit Duker’s testimony that the material produced during discovery showed that in early November 2019 Guggenheim was “getting companies to say they were interested” in Hembio. That is wrong. Guggenheim did not succeed in eliciting any interest to acquire Hembio or its assets, and therefore Rogers did not withhold any information that could have suggested there was such interest.
 
                                                            -19-
 
In mid-November 2019, Rogers spoke with two representatives from Janssen (Jim Tobin and Scott Lundeen). They told Rogers that the recent Iveric data made Janssen more interested in potential complement-based gene therapies for AMD, and that they therefore wanted to meet with Rogers at the upcoming J.P. Morgan conference in January 2020 to review Hembio’s 18-month clinical data. Rogers did not tell the other Founders about that conversation.
On November 13, 2019, Guggenheim sent an updated status report to Rogers. Guggenheim stated that Merck and AGTC were both still “active” contacts, and that both of them had signed CDAs and had gone into the data room. Roger did not share this status report with the other Founders.
Two days later, Guggenheim emailed Rogers to report on its most recent conversations with Janssen and Regenxbio. According to Guggenheim, (I) Janssen indicated that Iveric’s recent data made them more interested in Hembio, but that they had no intention of making any bid in December or even early January, and (ii) Regenxbio was not expressing any real interest in Hembio, but had not made any final decisions. The Court credits the testimony by Cameron Taylor of Guggenheim that at this point Janssen was essentially blowing off Guggenheim, and that although Janssen indicated that it wanted to keep monitoring how Hembio was doing Janssen was not engaging in any kind of substantive discussions. It also credits Taylor’s testimony that Regenxbio “did not engage” by ever showing any interest in doing a deal with Hembio. Rogers did not share this email with the other Founders.
1.12. Hembio Sells its Assets to Hemera. Hembio’s board voted November 18, 2019, to approve the asset sale to Hemera, the final Asset Purchase Agreement, and all related agreements and transactions. Duker, Reichel, and Rogers all voted in favor. Kumar-Singh abstained.
By adopting the resolutions that had previously been circulated to the board for its review and approval, the board confirmed that it had reviewed Hembio’s financial condition, its likely future operations and results, and all attendant risks, and found that Fireman had offered fair value to acquire Hembio’s assets. The resolutions also authorized Rogers to execute the APA on Hembio’s behalf and to seek approval of the sale from Hembio’s stockholders. The Hembio board knew that Rogers was Fireman’s son-in-law and that he would become CEO of the entity that was to purchase Hembio’s assets, and expressly acknowledged those conflicts when it voted to approve the transaction.
 
                                                            -20-
 
Hembio sold substantially all of its assets to Hemera Biosciences, LLC, through an Asset Purchase Agreement dated November 26, 2019. The APA provided that the consideration for this transfer was a cash payment by Hemera of almost $680,000 to cover Hembio’s existing liabilities, and the transfer of 10 percent of Hemera’s membership interests to Hembio, for redistribution to Hembio’s other shareholders (with a total of five percent being distributed proportionally to the noteholders, four percent going proportionally to the Series A investors, and one percent being shared proportionally by the common shareholders, including Duker, Reichel, and Kumar-Singh).
At the same time, Fireman and Hembio executed Hemera’s LLC agreement, which obligated Fireman to provide an additional $40 million in funding to Hemera in tranches as certain clinical trial or manufacturing milestones were met. Duker, Reichel, Kumar-Singh, and others soon executed a “Joinder Agreement” in which they accepted membership in Hemera and joined its LLC agreement. The joinder agreement released all claims against Hemera, Hembio, Fireman, and their former, present, and future officers, directors, and agents.
Dr. Rogers became Hemera’s CEO as planned. Fireman transferred $6 million to Hemera’s account not long after the APA and LLC agreement were executed, even though none of the milestones had been met and he was not yet required to do so. Hemera spent roughly $4.5 million from that sum over the next year, before it entered into an asset purchase agreement with Janssen.
1.13. Subsequent Asset Sale to Janssen. Hemera sold substantially all of its assets, including the HMR59 technology, to Janssen Pharmaceuticals in November 2020 for $85 million, plus the possibility of future payments if certain performance milestones were achieved. This deal close roughly one year after Hemera had acquired essentially the same assets from Hembio.
The Court credits the testimony by James Tobin, who was Janssen’s Vice President of External Research and Innovation through 2020, as to the timing of and reasons for Janssen’s decision to purchase Hemera’s assets.
Rogers first made a presentation on behalf of Hembio to Janssen in October 2018, where he discussed Hembio’s initial 6-month clinical data. Janssen thought the results were interesting, and that it was worth following Hembio’s Phase 1 clinical results as they developed. In July 2019, Guggenheim emailed Janssen, telling them that Hembio had just received its 18-month data showing that its treatment was having a positive clinical effect. Janssen expressed willingness to meet again, but made clear that it was in no rush to do so; Janssen
 
                                                            -21-
 
decided internally that it would continue to monitor Hembio’s progress. At the end of October 2019, the news that Iveric was reporting positive results for its complement-based AMD drug made Janssen more interested in complement- based therapy, but it was not enough to make Janssen want to pursue a possible deal with Hembio. The Court credits Tobin’s testimony that as of late October 2019 its interest in acquiring a complement-based genetic treatment for AMD was a “little bit higher” than it had been in January 2019.
When Janssen received Guggenheim’s “process letter” in early November 2019, it had absolutely no interest in making an offer for Hembio, or even in beginning due diligence. That is why Janssen told Guggenheim that Janssen was not going to provide any expression of interest in acquiring Hembio in the near future.
After reviewing Hembio’s 18-month data in January 2020, Janssen decided that it would make sense to pursue internal due diligence with respect to the HMR59 treatment. At this point it was the end of January.
The Court finds that Janssen decided that it would not be interested in pursuing a deal with Hemera unless and until it was satisfied that Chemistry, Manufacturing, and Controls (“CMC”) issues could be solved, and it was also convinced that the clinical results for HMR59 were robust even though they were based on a very small number of patients.
With respect to CMC issues, Janssen was concerned about its ability to manufacture sufficient quantities of HMR59 because the drug used a very complicated molecule. Janssen felt that if Johnson & Johnson (its parent) could not produce the drug, then there would be no point in trying to acquire it from Hemera. Janssen realized that the CMC for HMR59 was incredibly complex. and that, although Hembio had produced the drug at a very small scale for its clinical trials, producing enough to treat hundreds of thousands of people was a very different problem. Janssen and its parent do not like to move forward with expensive Phase 2 or Phase 3 clinical trials unless they are sure that it would be commercially viable to mass produce the drug being tested. It took several months for Janssen, working closely with Hemera and a third-party contract manufacturing organization, to solve the CMC issues. That took place during the Spring of 2020.
With respect to data robustness issues, Janssen was always skeptical about data from a small number of patients. Janssen received the 24-month Phase 1 clinical data for HMR59 in March 2020. The data were even more promising than the
 
                                                            -22-
 
18-month results, but Janssen was not sure whether to put much stock in the new data because they were based on such a small sample size. There were 17 patients with dry AMD enrolled in this clinical trial, and only nine of them had received the highest dose. Janssen worked to create a “synthetic control arm,” using data from 900 AMD patients with characteristics similar to the nine high- dose patients in Hemera’s clinical trial, that it could use to compare to and therefore analyze Hemera’s data. That work was not complete until late Summer of 2020.
The Court finds that Janssen did not decide to buy Hemera’s assets all of these aspects of due diligence were complete and it was satisfied that the CMC issues were solvable, it saw that the 24-month data showed a more positive effect from HMR59 than the 18-month data, and the analysis made possible by the synthetic control arm convinced Janssen that these data were robust.
Janssen first sent a non-binding letter of intent to Hemera on July 20, 2020. The Court credits Tobin’s testimony that even at that point Janssen had serious questions about Hemera’s data, and was not yet ready to negotiate or complete a deal. Janssen knew that other complement-based drugs for treating AMD had failed in prior trials, and that it could not pursue a deal with Hemera unless and until it convinced a lot of people within Johnson & Johnson that HMR59 was having a real and positive clinical effect.
By the early Fall of 2020, Janssen finally decided that it wanted to acquire Hembio’s assets. The companies proceeded to negotiate an asset purchase agreement. They executed this contract on November 23, 2020.
2. Claims against Rogers. Hembio did not release its claims against Dr. Rogers. On the merits, however, Hembio has not shown that Rogers withheld material information that a reasonable board would have considered to be significant in evaluating and respond to Mr. Fireman’s offer to pay off Hembio’s debts and commit to funding continued clinical trials of HMR59 as consideration for buying Hembio’s assets. Hembio’s claims that Rogers breached his duty of loyalty therefore fail, without Rogers having to show that Hembio’s asset sale satisfied the “entire fairness” standard or even “enhanced scrutiny” review.
2.1. No Release of Claims against Rogers. Hembio did not release its claims against Rogers for breach of fiduciary duty. Rogers asserts that such a release can be found in three separate contracts. The Court disagrees.
The Asset Purchase Agreement between Hembio and Hemera included a general release of claims that Hembio may have against Hemera or Fireman, or
 
                                                            -23-
 
against any of their former, present, or future affiliates, stockholders, members, officers, directors, managers, and employees (among others). This provision had the effect of releasing any claims against Rogers based on actions he took as Hemera’s CEO after the November 2019 transfer of assets from Hembio.
However, the APA release did not release claims against Rogers based on his conduct before that date as Hembio’s CEO.
Interpretation of an unambiguous written contract is a question of law for the Court to resolve. See Milton Investments, LLC v. Lockwood Bros., II, LLC, 2010 WL 2836404, at *4 (Del. Ch. July 20, 2010). “[W]hether a contract is unambiguous is [also] a question of law.” Sunline Commercial Carriers, Inc. v. CITGO Petroleum Corp., 206 A.3d 836, 847 n.68 (Del. 2019). “Contract language is not ambiguous merely because the parties dispute what it means.” Alta Berkeley VI C.V. v. Omneon, Inc., 41 A.3d 381, 385 (Del. 2012). Instead, Delaware follows “an objective theory of contracts, meaning that a contract’s construction should be that which would be understood by an objective, reasonable third party.” Stream TV Networks, Inc. v. SeeCubic, Inc., 279 A.3d 323, 338 (Del. 2022), quoting Cox Communications, Inc. v. T-Mobile US, Inc., 273 A.3d 752, 760 (Del. 2022).
The Court finds that the plain and unambiguous language of the APA release provision makes clear that Hembio did not release claims against Rogers arising from prior acts or omissions by Rogers while he was Hembio’s CEO.
Hembio also did not release any claims through the Joinder Agreement that Duker, Reichel, and Rosenberg signed to become members of Hemera in November 2019, or through the Release Agreements that these individuals signed a year later in connection with the subsequent asset sale by Hemera to Janssen. Hemera brought suit in Delaware in early 2024 in an attempt to enforce these other releases against Hembio; it sought an order barring Hembio from prosecuting this action and requiring that it dismiss this action, based on these releases. The Chancery Court held that Duker, Reichel, and Rosenberg did not execute those contracts on behalf of Hembio, and that these releases therefore do not bind Hembio. See Hemera Biosciences, LLC v. Duker, No. 2022-0926, transcript of oral rulings at 16–18 (Del. Ch. Feb. 19, 2024). Hembio provided a copy of this transcript as an exhibit to its post-trial brief. The Court agrees with and adopts the persuasive analysis by Vice Chancellor Fioravanti.[1]
 
--------------------------------------------
 
[1]                    The Chancery Court did not resolve the separate question of whether, by causing Hembio to bring this action, Druker and Reichel violated their
<continued…>
                                                            -24-
 
2.2. Legal Standards—Breach of Duty of Loyalty to Corporation. Hembio is and was a Delaware corporation, and therefore its claims against Dr. Rogers for breach of his fiduciary duty of loyalty are governed by Delaware law. See Harrison v. NetCentric Corp., 433 Mass. 465, 471–472 (2001) (law of state of incorporation governs corporation’s internal affairs, including fiduciary duties, and therefore applies to claim that officer or director breached fiduciary duty).
Rogers owed fiduciary duties of loyalty and care to Hembio because he was the CEO and a director of the corporation.[2] See United Food and Commercial Workers Union and Participating Food Industry Employers Tri-State Pension Fund v. Zuckerberg, 262 A.3d 1034, 1049 & n.117 (Del. 2021) (directors and officers of Delaware corporations owe fiduciary duties of loyalty and care to the corporation and its shareholders); Gantler v. Stephens, 965 A.2d 695, 708–709 (Del. 2009) (“corporate officers owe fiduciary duties that are identical to those owed by corporate directors”). An officer’s duty of loyalty includes a duty to act in good faith, which “requires candor with the board.” In re Oracle Corp. Derivative Litig., 2025 WL 249066, at *14 (Del. Jan. 21, 2025). The duty of care is no longer at issue in this case.[3]
Claims by a Delaware corporation seeking to impose personal liability on and recover damages from an officer or director for alleged disloyalty are not subject to the same standards that apply where shareholders challenge and seek  injunctive  relief  concerning board decisions.  The possibility  of  “entire
 
--------------------------------------------
 
covenants in the Joinder Agreement and Janssen releases not to “voluntarily participate in any judicial proceeding of any nature or description against any of the Released Parties with respect to any Claims released pursuant hereto.” The parties have not asked the Court to address this issue.
[2] Rogers owed the same fiduciary duties of care and loyalty to Hembio’s stockholders. See Dohmen v. Goodmen, 234 A.3d 1161, 1168 (Del. 2020); Arnold v. Society for Sav. Bancorp, Inc., 678 A.2d 533, 539 (Del. 1996); In re Columbia Pipeline Grp., Inc. Merger Litig., 299 A.3d 393, 453 (Del. Ch. 2023). But none of Hembio’s stockholders has sued Rogers. The remaining claims against Rogers are limited to whether he breached his duty of loyalty to Hembio; this case does not concern whether he also breached any duties that he owed to stockholders.
[3] Hembio had asserted a claim that Rogers breached his fiduciary duty of care, but it did not oppose entry of summary judgment in Rogers’ favor on that claim. Judge Ricciuti also granted summary judgment in Rogers’ favor on claims alleging unlawful usurpation of a corporate opportunity, fraud, and negligent misrepresentation. As a result, the only remaining claims against Rogers are for breach of his fiduciary duty of loyalty to Hembio.
 
                                                            -25-
 
fairness” review applies differently in the context of a personal liability claims, and intermediate “enhanced scrutiny” does not apply at all.
2.2.1. Business judgment rule. Hembio bears the burden of proving its claim that Rogers violated his duty of loyalty to the corporation by withholding material information, engaging in deceptive conduct, or otherwise misleading the board. Oracle Corp., 2025 WL 249066, at *14.
“[A] fiduciary must disclose information to the board that is ‘relevant and of a magnitude to be important to directors in carrying out their fiduciary duty of care in decisionmaking.’ ” Id., quoting City of Fort Myers Gen. Emps.’ Pension Fund v. Haley, 235 A.3d 702, 718 (Del. 2020). “The touchstone of the materiality inquiry is whether a reasonable board … would have regarded the existence of the undisclosed facts as significant.” Id.; accord Haley, 235 A.2d at 717.
If the evidence does not establish that Rogers breached his duty of loyalty to Hembio, then “ ’the business judgment rule attaches’ and operates to protect” Rogers “from personal liability” for decisions that he made and actions that he took as Hembio’s CEO and director. See McMullin v. Beran, 765 A.2d 910, 917 (Del. 2000), quoting Cede & Co. v. Technicolor, Inc., 634 A.2d 345, 361 (Del. 1993).
In Oracle Corp., for example, stockholders brought a derivative action claiming that the board’s Executive Chairman (Larry Ellison) and the CEO (Safra Catz) were personally liable to Oracle for breaching their fiduciary duties on a “fraud on the board” theory. The Delaware Supreme Court affirmed application of business judgment review rather than the entire fairness standard, and a resulting finding of no liability, because the plaintiffs failed to prove that Ellison or Catz breached their duty of loyalty by withholding material information. Oracle Corp., 2025 WL 249066, at *7, *11 & *14–*15.
2.2.2. Entire Fairness Standard. The burden will shift to Rogers “to prove the ‘entire fairness’ of the transaction” if, and only if, Hembio rebuts “the presumption of the business judgment rule.” See McMullin, supra; accord Oracle Corp., 2025 WL 249066, at *14; Cede, supra. In a “fraud on the board” case like this one, if the plaintiff shows that the defendant breached their duty of loyalty then that will shift the burden to the defendant to establish entire fairness.  See  Oracle  Corp.,  2025  WL  249066,  at *14.[4]   But  where  the alleged
 
--------------------------------------------
 
[4] The multi-factor test invoked by Defendants in their post-trial brief does not apply in a case like this. In Oracle Corp., the Chancery Court had ruled that, “[t]o shift the standard of review under a ‘fraud on the board’ theory, Plaintiffs
<continued…>
 
                                                            -26-
 
disloyalty is the failure to disclose information to the Board, and the plaintiff fails to prove that the non-disclosed information was of a magnitude that a reasonable board would have considered important, then there has been no breach of fiduciary duty, the business judgment rule applies, and the entire fairness standard is not implicated. Oracle Corp., supra; see also, e.g., In re Pattern Energy Group Inc. Stockholders Litig., 2021 WL 1812674, at *33 (Del. Ch. May 6, 2021) (entire fairness review not warranted in “fraud on the board” case unless plaintiff shows that fiduciary deceived board and deception was material).[5]
Where it applies, “[t]he entire fairness standard has two parts: fair dealing and fair price.” Kahn v. Tremont Corp., 694 A.2d 422, 432 (Del. 1997). The “fair dealing” aspect focuses on how the transaction was conducted, including its initiation, structure, and negotiation, and whether all material information was disclosed. See Mills Acquisition Co. v. Macmillan, Inc., 559 A.2d 1261, 1280 (Del. 1989). The “fair price” aspect asks whether the price at which a challenged transaction was conducted falls within a range of fair value, that a seller with access to all relevant information might reasonably accept. See Reis v. Hazelett Strip-Casting Corp., 28 A.3d 442, 466 (Del. Ch. 2011). “Although the entire fairness standard has two components, the entire fairness analysis is ‘not a bifurcated one as between fair dealing and fair price. All aspects of the issue must be examined as a whole since the question is one of entire fairness.’ ”
 
--------------------------------------------
 
must prove 1) that the fiduciary was materially interested, 2) that the board
was inattentive or ineffective, 3) that the fiduciary deceived or manipulated the board, 4) that the deception was material, and 5) that the deception tainted the decisionmaking process of the board.” In re Oracle Corp. Derivative Litig., No. 2017-0337-SG, 2023 WL 3408772, at *27 (Del. Ch. May 12, 2023). Judge Ricciuti applied that test when he decide Rogers’ summary judgment motion in December 2023. Defendants continue to argue that it applies here. Just months ago, however, the Delaware Supreme Court held that this multi-factor test does not apply “when it comes to fiduciaries accused of disloyal conduct.” Oracle Corp., 2025 WL 249066, at *14 & n.109.
[5] Though Oracle Corp. was not decided until January 21, 2025, on the sixth day of the trial of this case, Hembio was on notice long before trial that it must prove that Rogers withheld material information in order to shift the burden to Rogers to establish that Hembio’s asset sale transaction met the entire fairness standard. The five-factor test that the Delaware Chancery Court had been applying in fraud-on-the-board cases before Oracle Corp required in part that plaintiffs must prove the fiduciary had made a material misrepresentation to the board. See, e.g., Pattern Energy, 2021 WL 1812674, at *33. Defendants made this point nine months before trial in the joint pretrial memorandum.
 
                                                            -27-
 
Americas Mining Corp. v. Theriault, 51 A.3d 1213, 1244 (Del. 2012), quoting Weinberger v. UOP, Inc., 457 A.2d 701, 711 (Del. 1983).
2.2.3. Enhanced Scrutiny. The intermediate ”enhanced scrutiny” standard of review is not implicated here because this is not a lawsuit by shareholders challenging a board’s decision to sell the corporation’s assets, but instead involves claims by a corporation alleging that its CEO was disloyal and should be held personally liable for committing a fraud on the board.
In cases where shareholders challenge a vote by a corporation’s directors to sell substantially all of the company’s assets or to engage in another form of “final stage” transaction—and there is no proof of any fraud on the board, self- interest by board members, or control by a majority shareholder—the vote is subject to an “intermediate standard of enhanced scrutiny.” Pattern Energy, 2021 WL 1812674, at *31; accord Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc., 506 A.2d 173, 180–184 (Del. 1986); Huff Energy Fund, L.P. v. Gershen, 2016 WL 5462958, at *13 (Del. Ch. Sept. 29, 2016).
In contrast, “ ’[a] court does not apply enhanced scrutiny when determining whether a fiduciary should be held liable’ for damages.” Teamsters Local 677 Health Services & Ins. Plan v. Martell, 2023 WL 1370852, at *21 (Del. Ch. 2023), quoting Firefighters' Pension Sys. of City of Kansas City, Missouri Tr. v. Presidio, Inc., 251 A.3d 212, 252 (Del. Ch. 2021).
In other words, though enhanced scrutiny may apply in the “transactional justification setting” where a court must decide whether to enjoin a corporate transaction or enter other injunctive relief that operates on a transactional basis, it does not apply in “the personal liability setting.” Presidio, supra, at 251–252, quoting Unitrin, Inc. v. American General Corp., 651 A.2d 1361, 1374–75 (Del. 1995) (noting difference between “transactional justification cases” where enhanced scrutiny applies, and “personal liability” cases against a corporate fiduciary where the business judgment rule applies); accord In re Riverstone National, Inc. Stockholder Litig., 2016 WL 4045411, at *7 (Del. Ch. July 28, 2016) (though enhanced scrutiny applies where stockholders seek injunction to prevent a merger transaction, in case where ex-stockholders challenge fairness of merger and seek damages from directors “judicial review ends” if plaintiffs fail to “demonstrate a non-exculpated breach of duty”); see also Corwin v. KKR Financial Holdings LLC, 125 A.3d 304, 312 (Del. 2015) (enhanced scrutiny is “primarily designed to give stockholders … the tool of injunctive relief to address important M & A decisions in real time, before closing,” and was not “designed with post-closing money damages in mind”).
 
                                                            -28-
 
“The fact that a corporate board has decided to engage in a change of control transaction invoking so-called Revlon duties does not change the showing of culpability a plaintiff must make in order to hold the directors liable for monetary damages.” Presidio, supra, at 253, quoting McMillan v. Intercargo Corp., 768 A.2d 492, 502 (Del. Ch. 2000). “When assessing personal liability, a court must determine whether the fiduciary breached either the duty of loyalty, including its subsidiary element of good faith, or the duty of care.” Id.; accord Oracle Corp., 2025 WL 249066, at *14–*15.
2.3. Rogers Did Not Withhold any Material Information. The Court makes the following findings of fact regarding materiality based on the record evidence, the Court’s evaluation of witness credibility, and reasonable inferences that the Court has drawn from that evidence.
As noted above in § 2.2.1 of this decision, information withheld from the board of a Delaware corporation is “material” if and only if “a reasonable board … would have regarded the existence of the undisclosed facts as significant.” Oracle Corp., 2025 WL 249066, at *14. This is an objective standard.
The Court finds that a reasonable board would not have considered any of the information withheld by Rogers to be significant, and would also not have considered that information as a whole to be significant. The Court therefore finds that Rogers did not withhold any material information from Hembio’s board as it was considering in late 2019 whether to sell substantially all of Hembio’s assets to an entity that would be controlled by Fireman.
Since Hembio has not established that Rogers breached his duty of loyalty by withholding material information, Rogers has no burden of showing that Hembio’s sale of its assets met the “entire fairness” standard, and instead the business judgment rule protects Rogers from personal liability. See Oracle Corp., 2025 WL 249066, at *14.[6] For the reasons discussed above in § 2.2.4 of this
 
--------------------------------------------
 
[6] In its post-trial brief, Hembio does not address whether the evidence presented at trial establishes that Dr. Rogers breached his fiduciary duty of loyalty to Hembio by withholding material information or otherwise. Instead, Hembio merely asserts, without explanation or argument, that Judge Ricciuti’s prior summary judgment ruling that the entire fairness standard applies to the breach of loyalty claims against Rogers “should stand,” and then argues that Rogers failed to prove that Hembio’s asset sale was entirely fair.
Judge Ricciuti’s summary judgment ruling does not bind the Court. When he concluded that the evidence in the summary judgment record “would permit
<continued…>
 
                                                            -29-
 
decision, the “enhanced scrutiny” does not apply to Hembio’s claim seeking damages against Rogers either.
The Court does not credit Dr. Duker’s and Dr. Reichel’s self-serving testimony that they would not have approved the asset purchase agreement with Hemera, and instead would have redoubled efforts to raise funds from the Series A investors or from experienced biotech investors like Cormorant and Perceptive, if they had known in November 2019 that companies had accessed Hembio’s data rooms to review detailed clinical results, Janssen was interested in  meeting  Rogers  and  reviewing Hembio’s  18-month  clinical  trial data  in
 
--------------------------------------------
 
a rational jury to conclude that Rogers omitted material information  from the Board,” that “there is evidence supporting that Rogers’ nondisclosures were material and tainted the Board’s decision-making process,” and that if so then the entire fairness standard would apply, Judge Ricciuti was merely indicating that the issues of materiality and therefore whether the entire fairness standard was implicated could not be resolved as a matter of law on Rogers’ motion for summary judgment. But Judge Ricciuti did not rule that the materiality of the nondisclosures was “not in controversy” and therefore “shall be deemed established” for purposes of the subsequent trial. See Mass. R. Civ. P. 56(d).
Judge Ricciuti was required to “draw all reasonable inferences” from the evidence “in favor of the nonmoving party,” meaning in favor of Hembio, in deciding the summary judgment motion. Godfrey v. Globe Newspaper Co., Inc., 457 Mass. 113, 119 (2010). At trial, in contrast, Hembio had to meet its burden of proving the elements of its claims.
The Court may reach a different conclusion as to whether nondisclosures were material based on evidence presented during the 11-day trial. See Phoenix Home Life Mut. Ins. Co. v. Brown, 49 Mass. App. Ct. 657, 661 (2000) (trial judge not bound by ruling on summary judgment that insurer committed unfair settlement practice by insisting on release as condition of payment of life insurance proceeds); Waste Management of Massachusetts, Inc. v. Carver, 37 Mass. App. Ct. 694, 699 (1994) (trial judge not bound by prior summary judgment ruling where “the papers before the motion judge were different from the detailed testimony before the trial judge”).
Since final judgment has not entered, the Court has “broad discretion” to reconsider all prior rulings in this case, including whether nondisclosures by Dr. Rogers were material. See Genesis Technical & Fin., Inc. v. Cast Navigation, LLC, 74 Mass. App. Ct. 203, 206 (2009); accord Herbert A. Sullivan, Inc. v. Utica Mut. Ins. Co., 439 Mass. 387, 401 (2003) (“it is within the inherent authority of a trial judge to ‘reconsider decisions made on the road to final judgment.’ ”) (quoting Franchi v. Stella, 42 Mass. App. Ct. 251, 258 (1997)).
 
                                                            -30-
 
January 2020, and Guggenheim and Rogers were continuing their efforts to interest companies like Merck and AGTC in a possible acquisition of Hembio.
2.3.1. Merck. The Court finds that Rogers did not withhold any material information about contacts with Merck.
When Duker and Reichel voted on November 18, 2019, to sell Hembio’s assets, they knew that Merck had been showing more interest in a possible acquisition of Hembio than any other potential buyer. They knew that Rogers and Kumar- Singh met for the third time with Merck’s team on July 22, Merck had signed a CDA and in early September accessed Hembio’s detailed clinical data, Rogers met with the Merck team a fourth time on October 4, that meeting had gone very well, and Rogers believed Merck was continuing to show real interest in a possible acquisition of Hembio.
Rogers did provide the board with Guggenheim’s mid-November status report stating that contacts with Merck were still “active” and reiterating that Merck had signed a CDA and entered the data room. Nor did he inform the board that in early November Guggenheim sent a “process letter” to Merck, but Merck had not responded.
Duker and Reichel approved Hembio’s sale of assets to Hemera despite the continued interest from Merck because they knew that the steps Merck had taken were no indication that it was at all likely to make an offer to acquire Hembio or its assets. No reasonable board would have come to a different conclusion if it had been told that the outreach to Merck was still “active,” or if it had learned that Guggenheim sent a “process letter” to Merck in early November but Merck had not responded. A reasonable board would have understood that additional information to mean only that Merck had not yet said it was no longer interested in Hembio, but would not believe that it showed there was any likelihood that Hembio could ever consummate a deal with Merck. The Court therefore finds that no reasonable board would have considered that additional information to be significant.
The board knew, and any reasonable board would have concluded, that as of mid-November 2019 Hembio had no better alternative to accepting Fireman’s offer to pay the company’s debts, transfer ownership of Hembio’s assets to Hemera, convince the noteholders to convert their obligations to common stock, give Hembio’s stockholders and noteholders a small minority stake in Hemera, and commit to providing another $40 million in funding so that the clinical trials of HMR59 could move forward.
 
                                                            -31-
 
By that time Hembio was essentially out of cash, the existing Series A investors made clear they were unwilling to providing any additional funding through a Series A-2 round, no venture capital or biotech firm expressed any interest in providing funding through a Series B round, no company had responded to Guggenheim’s efforts by expressing any interest in making an offer to purchase Hembio or its assets, and Hembio was obligated to pay its noteholders roughly
$5.8 million in less than two months. The board knew full well from the failed Series A-2 round that none of the Series A investors (other than Fireman and Rogers) was willing to invest further in Hembio. And it knew from the failed Series B investment efforts that Cormorant, Perceptive, and other experienced biotech investors were also unwilling to provide Hembio with more capital.
Under these circumstances, no reasonable board would have evaluated Hembio’s prospects any differently if were told in mid-November that Hembio’s contacts with Merck were still “active” but that Merck had not responded to Guggenheim’s process letter. And no reasonable board would have thought that such limited additional information about Merck would have changed their ability to negotiate with Fireman. In sum, the Court finds that the very limited information that Rogers did not share with the Board about Merck in November 2019 was not material, because a reasonable board would not have considered that information to be significant.
2.3.2. AGTC. For much the same reasons, the Court finds that Rogers did not withhold any material information about contacts with AGTC.
The board knew as of early October 2019 that Guggenheim had scheduled an initial meeting with representatives of AGTC.
Rogers did not tell that board that this meeting took place as scheduled in mid- October, AGTC then signed a CDA and was given access to a data room, and a few days later Guggenheim sent AGTC a “process letter” asking it to submit a non-binding letter of interest by December 10.
The Court finds that no reasonable board would have considered this additional information about AGTC to be significant in deciding whether to accept Fireman’s offer in November 2019. AGTC was not even as far along as Merck in the process of evaluating HMR59. No reasonable board would have believed that AGTC’s conduct in signing a CDA and reviewing more detailed information, or the fact that AGTC had received but not responded to a “process letter” from Guggenheim, suggested in the least that AGTC may be interested in acquiring Hembio.
 
                                                            -32-
 
On December 6, 2019, just ten days after Hembio executed the asset purchase agreement with Hemera, AGTC wrote Rogers to say that it had decided not to pursue any kind of strategic transaction with Hembio because it “could not get comfortable there was sufficient proof of concept (ie: reduction of risk profile)” for the HMR59 treatment program. This confirms that Rogers was not withholding any material information about nascent interest by AGTC.
2.3.3. Janssen. The Court also finds that Rogers did not withhold any material information about Hembio’s very limited contacts with Janssen before Hembio sold its assets to Hemera.
Rogers and Guggenheim had informed the board of Janssen’s interest in scheduling a further meeting after the 18-month clinical data became available in mid-2019. They updated the board at least six times from July through September that they were working to set up a further meeting with Janssen.
Though Rogers did not tell the board that Janssen offered in late October and in mid-November to meet with Rogers at the J.P. Morgan conference in January 2020, the Court finds that no reasonable board would have considered that additional information to be significant. A reasonable board would have understood that large biopharmaceutical companies like Janssen schedule many meetings with potential business partners during this annual conference, and that Janssen’s willingness to meet with Rogers at this time did not suggest any strong interest on Janssen’s part. The Court credits Tobin’s testimony that Janssen participated in roughly 300 meetings during the January 2020 conference. Furthermore, a reasonable board would have understood that Janssen’s willingness to take a meeting to discuss the 18-month data—after being asked to do so repeatedly for many months—would have no practical import because Hembio had run out of cash and was obligated to pay its noteholders $5.8 million before that meeting would take place.
Similarly, a reasonable board would not have considered it significant to learn that Guggenheim sent a “process letter” to Janssen in early November, and that Janssen promptly responded by saying it was not going to proceed on the schedule set by Guggenheim and would definitely not submit any bid or expression of interest by December 10, or even in January. No reasonable board would consider that to have been an expression of serious interest in acquiring Hembio, and thus no reasonable board would have considered that information to be significant.
 
                                                            -33-
 
In its opening statement at the start of trial, Hembio contended that the process of selling the HMR59 assets to Janssen had begun before Hembio entered into the asset purchase agreement that conveyed those assets to Hemera, and that Rogers had withheld that critical information from the board.
The Court finds that is not true. It credits Tobin’s testimony that Janssen had “no interest” in making any kind of offer to Hembio in November 2019. Tobin saw the planned meeting with Rogers in January 2020 as an opportunity for some key stakeholders at Janssen to see Hembio’s clinical data for the first time. As discussed above in § 1.13 of this decision, Janssen did not decide even to begin an internal due diligence process with Hembio until the end of January 2020. And Janssen did not decide to enter into a serious process of trying to buy the HMR59 technology until late in the Summer of 2020. Janssen did not make any decision to pursue Hembio until after it had figured out the CMC issues during the Spring of 2020 to ensure it could manufacture the drug in sufficient quantities. And it did not decide to make a serious effort to acquire Hembio’s assets until after it had laboriously constructed a synthetic control arm of data from 900 patients and used it in the Summer of 2020 to evaluate the robustness of the limited data generated by the HMR59 Phase 1 clinical trial.
In sum, the Court finds that Rogers did not withhold from the Hembio board any information suggesting that as of November 2019 Janssen might have a real interest in acquiring Hembio, because that was not true and there was no such information.
2.3.4. Guggenheim’s Process Letters. Though Rogers did not tell the board that Guggenheim sent out “process letters” in early November 2019, that information would not have made any material difference in the board’s decision making process about Fireman’s second offer. The Court finds that no reasonable board would have considered that information to be significant.
The board knew in July 2019 that Guggenheim planned to impose “bid deadlines” on potentially interested companies once it had achieved “a bit more visibility” for Hembio. It knew in mid-August 2019 that Guggenheim would work to get a “definitive answer” from those companies within three or four months, meaning by mid-December. And the board knew in September 2019 that Guggenheim was in contact with all of the companies that later received process letters.
As a result, if Rogers had informed the board that Guggenheim did in fact send out nine process letters in early November and set a December 10 deadline for
 
                                                            -34-
 
expressions of interest, that would merely have confirmed that Guggenheim had in fact done what the board expected it was going to do.
The Court finds that a reasonable board would not have considered the sending of the process letters to be material information that would make a significant difference in its evaluation of Fireman’s second offer because (I) a reasonable board would have understood that the sending of process letters did not suggest that any of the target companies had any interest in acquiring Hembio or its assets, and (ii) as discussed above, by this time Hembio was out of cash, facing an imminent deadline to repay its noteholders, and had no realistic option other than accepting Fireman’s offer.
The Court finds that a reasonable board would have understood that investment bankers often use process letters like this in an attempt to elicit interest in a possible merger or acquisition transaction, and that sending such letters does not imply that any of the recipients has any real interest in pursuing such a deal. As Jim Tobin of Janssen explained at trial, “every investment banker does this. And the minute you push back, the process letters usually disappear.”
2.3.5. Rogers’ Failed Efforts to Limit Rights of Hemera Minority Members. As discussed above in § 1.10 of this decision, Rogers urged Fireman to revise Hemera’s draft LLC Agreement to limit the ability of Druker, Reichel, and Kumar-Singh to require five days advance notice before any meeting of Hemera’s members, to obtain access to Hemera’s books and records, to benefit if Fireman were to sell half or more of his membership interest in Hemera, and to limit future amendments to Hemera’s LLC Agreement.
But this is all beside the point because, as the Court also found above, Fireman’s attorney rejected these suggestions and kept the provisions challenged by Rogers in the final LLC Agreement.
Rogers did not breach his fiduciary duty to Hembio by trying but failing to modify Hemera’s LLC Agreement to strip out protections for future minority members of the Hemera.
The Court finds that a reasonable board considering whether to accept Fireman’s second offer would not have found it significant to learn that Rogers had urged Fireman to delete from Hemera’s LLC Agreement certain provisions protecting rights of minority members, but that Fireman had rejected that advice and kept those provisions in the final form of the contract.
 
                                                            -35-
 
2.3.6. Private Offers to Kumar-Singh. Hembio argues in its post-trial brief that “Rogers and Friedman also lacked candor in their secret deals to Kumar- Singh.” The Court finds that no reasonable board deciding in November 2019 whether to accept Fireman’s offer to purchase Hembio’s assets would have considered it significant that Fireman had made private offers to buy some and then all of Kumar-Singh’s Hembio stock in June and September 2019, and that Kumar-Singh turned down the first offer and the second one evaporated when Fireman withdrew his initial, September 2019 offer to recapitalize Hembio. Learning that Fireman had made special offers to Kumar-Singh would not have changed a reasonable board’s evaluation of whether Hembio had any better alternative in November 2019 than to accept Fireman’s second offer.
2.3.7. Withheld Information as a Whole. The Court further finds that if a reasonable board had been provided with all of the information that Hembio now contends was improperly withheld by Rogers, and considered that information as a whole in the context of everything else known to the board when it evaluated Fireman’s final offer, such a reasonable board would not have considered the withheld information as a whole to be significant. Because Hembio was in such dire financial straits, no reasonable board would have believed upon learning about all of the withheld information that the board had an opportunity to negotiate for better terms from Fireman, or that it had an opportunity to obtain alternative funding from the Series A investors, from investment funds like Cormorant and Perceptive, or from any other source. The Court therefore finds that, when considered as a whole, the information that Rogers did not provide to the board was not material.
3. Claims against Fireman and Hemera. Let’s turn to Hembio’s claim against Mr. Fireman and Hemera LLC for aiding and abetting the alleged breach of fiduciary duty by Dr. Rogers.[7] This claim is barred by the general release that Hembio gave to Fireman and Hemera. Even if Hembio had not released the claim, Hembio has not proved that Rogers committed any underlying breach of fiduciary duty, or that Fireman and Hemera knowingly participated in any breach by Dr. Rogers of the fiduciary duties that he owed to Hembio.
 
--------------------------------------------
 
[7 ]Judge Ricciuti granted summary judgment in Fireman’s favor on Hembio’s claims for fraud, negligent misrepresentation, and breach of the duty of loyalty. He also granted summary judgment in favor of Fireman and Hemera on Hembio’s claim for usurpation of a corporate opportunity.
 
                                                            -36-
 
The parties assume, without providing any choice of law analysis, that Delaware law governs the aiding and abetting claim. The Court will therefore do the same.[8]
3.1. Release of Aiding and Abetting Claims. The Asset Purchase Agreement that Hembio entered into with Hemera in November 2019 fully released all of Hembio’s claims against Mr. Fireman and against Hemera. It therefore bars the claim for aiding and abetting an alleged breach of fiduciary duty.
The APA refers to Hemera as the “Buyer” and Fireman as the “Principal.” It includes a general release of all claims against both the Buyer and the Principal.
This release means what is says: Hembio “irrevocably, unconditionally and fully release[d]” all possible claims that it may have had against Firearm or Hemera. This release protects Fireman, even though he is not a party to the APA, because the release language is “crystal clear and unambiguous in its inclusion of” Fireman “among the parties released.” Balinski v. Baker, 2013 WL 4521199, at *5 (Del. Super. Aug. 22, 2013), quoting Rochen v. Huang, 1989 WL 5374, at *1 (Del. Super. Jan. 4, 1989). Furthermore, the plain language of this provision makes clear that it is a general release of all possible claims by Hembio against either Fireman or Hemera, and not a limited release of only
 
--------------------------------------------
[8] If the parties had not implicitly agreed otherwise in their post-trial briefs, the Court may have found that Massachusetts law governs the claims against Fireman and Hemera. For tort claims that do not involve personal injury, Massachusetts applies the law of the state that “has the most significant relationship to the occurrence and the parties.” Cosme v. Whitin Mach. Works, Inc., 417 Mass. 643, 647 n.3 (1994), quoting Restatement (Second) of the Law of Conflict of Laws § 145(1). To determine which state has the most significant relationship, a court must consider where the injury occurred; where the conduct causing the injury occurred; where the parties reside, are incorporated, and conduct business; and where the relationship between the parties is centered. Id. at 647 & n.3 (applying Restatement § 145(2)). Other than the fact that Hembio was incorporated in Delaware, the rest of these factors all seem point to Massachusetts with respect to Hembio’s aiding and abetting claim.
But neither side suggests there is any material difference between Delaware and Massachusetts law as to this claim. The Court may therefore follow the parties’ lead and apply Delaware law without conducting any choice of law analysis. “Only actual conflicts between the laws of different jurisdictions must be resolved.” UBS Financial Services, Inc. v. Aliberti, 483 Mass. 396, 405 n.12 (2019), quoting Kaufman v. Richmond, 442 Mass. 1010, 1012 (2004) (rescript). “Choice of law analysis is unnecessary when that choice will not affect the outcome of the case.” Kaufman, supra.
 
                                                            -37-
 
certain kinds of claims. Since the language of this release is clear, the Court must give it effect as a general release. See Corporate Property Assocs. 6 v. Hallwood Group Inc., 817 A.2d 777, 779 (Del. 2003).
A release is not enforceable if it was procured by fraud or if it was obtained by a fiduciary with a duty of full disclosure who fails to disclose material facts. See E.I. DuPont de Nemours and Co. v. Florida Evergreen Foliage, 744 A.2d 457, 460– 461 (Del. 1999) (release obtained by fraud); Bin v. Heckmann Corp., 2009 WL 3440004, at *7 (Del. Ch. Oct. 26, 2009) (release obtained by fiduciary who fails to disclose material facts); accord Sher v. Sandler, 325 Mass. 348, 354 (1950) (“where a release is obtained without a full disclosure of the relevant facts by one who is under a duty to reveal them, it can be set aside”).
The Court finds, however, that neither Fireman nor Hemera engaged in any kind of fraud in negotiating and entering into the APA. As discussed above, the Court finds that Dr. Rogers did not withhold any material information from Hembio’s board. And since Mr. Fireman was no longer a director of Hembio when the APA was negotiated, he no longer owed no fiduciary duty to Hembio and thus could not have breached any such duty in obtaining a release. In sum, Hembio has failed to establish that Fireman and Hemera are not entitled to enforce and obtain full benefit of this general release.
3.2. Merits of Aiding and Abetting Claim. In any case, even if Hembio had not released the aiding and abetting claim against Fireman and Hemera, the Court finds that Hembio has failed to prove that claim.
To prove its claim for aiding and abetting a breach of fiduciary duty, Hembio must prove: “(1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, ... (3) knowing participation in that breach by the defendants, and (4) damages proximately caused by the breach.” In re Mindbody, Inc., Shareholder Litig., 332 A.3d 349, 389 (Del. 2024), quoting Malpiede v. Townson, 780 A.2d 1074, 1096 (Del. 2001).
The element of “knowing participation” requires both “knowledge” and “participation.” Id. at 390. With respect to the requirement of “knowledge,” a plaintiff asserting such a claim must establish that the defendant knew the primary party was breaching their fiduciary duty, and also knew their own conduct was legally improper. Id. at 389–390. With respect to the requirement of “participation,” the  plaintiff must  establish  that  the defendant  provided “ ’substantial assistance’ to the primary violator;” in other words, “active
 
                                                            -38-
 
participation” in the breach of fiduciary duty, rather than “passive awareness” of another’s breach, is required. Id. at 392–396.
Hembio failed to prove the second and third elements of this claim.
The Court found above that Rogers did not breach his duty of loyalty to Hembio. As a result, neither Fireman nor Hemera is liable for aiding and abetting any breach of that duty. If no underlying breach of fiduciary duty is proved at trial, “the aiding and abetting claim fails.” In re Wayport, Inc. Litig., 76 A.3d 296, 323 (Del. Ch. 2013); accord GB-SP Holdings, LLC v. Walker, 2024 WL 4799490, at *51 (Del. Ch. Nov. 15, 2024).
Even if Rogers had committed a fraud on the board by withholding material information, which he did not, the Court finds that Fireman and Hemera could not be held liable on an aiding and abetting theory because they “took no action to facilitate or assist” the alleged breach but at worst “passively stood by” while Rogers (allegedly) breached his fiduciary duty. See Mindbody, 332 A.3d at 401.
The Court finds that Hembio has not proved that Fireman or Hemera knew what information Rogers was or was not providing to the other Founders after October 3, 2019, or that they actively participated in the withholding of any material information. It also finds that Fireman and Hemera did not participate in Rogers’ attempts in November 2019 to undercut the rights of future minority members of Hemera, because they rejected Rogers’ proposed revisions to Hemera’s draft LLC Agreement.
In sum, even if Hembio had not released this claim, and even if Hembio had proved that Rogers committed an underlying breach of fiduciary duty, the aiding and abetting claim would still fail because Hembio did not prove the third element of this claim.
ORDER
Final judgment in this case shall enter providing as follows:
This case having come before the Court and the issues having been duly heard and decided, in part on defendants’ motion for summary judgment and in part after a non-jury trial on the remaining claims, it is hereby declared, ordered, and adjudged that plaintiff Hembio, Inc., shall take nothing on any of its claims.